■ ANTONIO LOPEZ, Respondent, v GEM GRAVURE CO., INC., et al., Appellants, et al., Defendants. (And Third-Party Actions.) [858 NYS2d 226]—

In an action to recover damages for personal injuries, the defendants Gem Gravure Co., Inc., Matthews International Corp., and Willett Limited each separately appeal, as limited by their briefs, from so much of an order of the Supreme Court, Kings County (Schneier, J.), dated December 11, 2006, as, upon renewal, vacated its prior order dated June 30, 2006, granting that branch of their motion which was for summary judgment dismissing the complaint insofar as asserted against them, and thereupon denied that branch of the motion.

Ordered that the order is affirmed insofar as appealed from, with one bill of costs.

Upon renewal, the Supreme Court properly denied that branch of the motion of the defendants Gem Gravure Co., Inc., Matthews International Corp., and Willett Limited (hereinafter collectively the chemical defendants) which was for summary judgment dismissing the complaint insofar as asserted against them. In opposition to the prima facie showing made by the chemical defendants, the plaintiff adduced sufficient evidence to

raise a triable issue of fact as to whether his exposure to chemicals contained in products manufactured and sold by the chemical defendants caused him to suffer from end-stage renal failure (see *Parker v Mobil Oil Corp.*, 7 NY3d 434, 448 [2006]). In reply, the chemical defendants submitted expert affidavits assailing the opinions of the plaintiff's experts, which merely raised issues of credibility that are for a jury to resolve (see *Barbuto v Winthrop Univ. Hosp.*, 305 AD2d 623, 624 [2003]; *Stoves v City of New York*, 293 AD2d 666, 667 [2002]; *Halkias v Otolaryngology-Facial Plastic Surgery Assoc.*, 282 AD2d 650, 651 [2001]). In light of the conflicting expert opinions, upon renewal, the court properly denied the summary judgment motion (see *Barbuto v Winthrop Univ. Hosp.*, 305 AD2d at 624; *Zarzana v Sheepshead Bay Obstetrics & Gynecology*, 289 AD2d 570, 571 [2001]).

We note our disagreement with our dissenting colleague's conclusion that one of the plaintiff's experts, Dr. Jacqueline Moline, is unqualified to render an opinion because she specializes in environmental and occupational medicine, rather than nephrology. An expert is qualified to render an opinion if he or she is "possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the information imparted or the opinion is reliable" (*Matott v Ward*, 48 NY2d 455, 459 [1979]). As a board-certified physician in internal medicine and occupational medicine, the vice-chair of the Department of Community and Preventive Medicine and an Associate Professor in the Department of Community and Preventive Medicine and Internal Medicine at the Mount Sinai School of Medicine, and as a physician who has extensively lectured and published on occupational medicine, Dr. Moline is qualified to render an opinion in this case (see *Miele v American Tobacco Co.*, 2 AD3d 799, 802 [2003]; *Matter of Enu v Sobol*, 208 AD2d 1123, 1124 [1994]). The chemical defendants' objections to Dr. Moline's qualifications do not preclude the admission of her testimony, but only raise an issue of fact as to the weight to be accorded to it, which is for a jury to resolve (see *Liriano v Hobart Corp.*, 92 NY2d 232, 241 [1998]; *Miele v American Tobacco Co.*, 2 AD3d at 802).

Further, the plaintiff's failure to warn cause of action, based on the chemical defendants' material safety data sheets for specific chemicals to which the plaintiff allegedly was exposed, was not preempted by the federal Occupational Safety and Health Administration standards or the regulations promulgated thereunder (see *Gade v National Solid Wastes Management Assn.*, 505 US 88, 107 [1992]; *In re Welding Fume Prods. Liab.*

*Litig.*, 364 F Supp 2d 669, 697 [2005]; *see also Darsan v Guncalito Corp.*, 153 AD2d 868, 870 [1989]; *accord Gross v Edmer Sanitary Supply Co.*, 154 AD2d 652, 654 [1989]). To the extent that the chemical defendants otherwise contend that this cause of action should be dismissed, their argument raises an issue of the adequacy of the warnings, which is for a jury to resolve (*see DaBenigno v Sunbeam Corp.*, 216 AD2d 248, 249 [1995]).

Finally, contrary to the chemical defendants' contention, the Supreme Court did not give collateral estoppel effect to the decision and order of the Appellate Division, Third Department, dated July 13, 2006, in the plaintiff's worker's compensation proceeding against his employer, in which that Court determined that a question of fact existed as to causation (*see Matter of Lopez v Superflex, Ltd.*, 31 AD3d 914 [2006]). Rather, the Supreme Court merely relied on that decision, which constituted new facts and which post-dated its June 30, 2006 order, to grant the plaintiff's motion for leave to renew, which was not improper (*see* CPLR 2221 [e]; *Peycke v Newport Media Acquisition II, Inc.*, 40 AD3d 722 [2007]). Santucci, Covello and McCarthy, JJ., concur.

Lifson, J.P. (dissenting and voting to reverse the order dated December 11, 2006, insofar as appealed from, and reinstate the order dated June 30, 2006, with the following memorandum): The plaintiff was an employee of Superflex Limited (hereinafter Superflex), which manufactures flexible plastic hoses. He worked on production lines, where labeling was printed on the hoses. His job required him to load ink and place it into the printer, apply printing to the hoses, and then coil and pack the hoses. He did not use gloves to perform his job. The inks applied and the cleaning solvents used by the plaintiff were manufactured by the defendants Gem Gravure Co., Inc., Matthews International Corp., and Willett Limited (hereinafter collectively the chemical defendants).

The plaintiff brought the instant action against, among others, the chemical defendants, alleging that his exposure to various chemicals (including ketones) contained in the products manufactured by the chemical defendants to which he was exposed, caused him to suffer renal failure or end-stage renal disease (hereinafter ESRD). The procedural context in which this appeal comes before us is quite complex, involving the plaintiff's application to the Workers' Compensation Board, a reversal by the Appellate Division, Third Department, of the initial denial of benefits for lack of sufficient evidence of causation (*see Matter of Lopez v Superflex, Ltd.*, 31 AD3d 914 [2006]), and, upon

renewal, the Supreme Court's vacatur of its original order granting the chemical defendants' motion for summary judgment dismissing the complaint insofar as asserted against them.

In the instant case, the chemical defendants, on their summary judgment motion, asserted that the plaintiff's experts' opinions were scientifically unreliable because they failed to identify a single study finding that occupational exposure to ketones over the relatively brief period of 21 months that the plaintiff was exposed to the chemicals, which were inherent in the performance of his job, can result in ESRD, failed to quantify the plaintiff's exposure, and failed to identify any judicial opinion admitting similar testimony. The chemical defendants further argued that there was no toxicological evidence that ketones caused kidney failure in humans, and that the plaintiff failed to provide any specific quantitative exposure data. They contended that the plaintiff could not show the extent of his ketone exposure during his employment, and without such data, he could not sustain his burden of demonstrating, with any degree of scientific certainty, that a harmful exposure occurred.

In his affidavit, an expert for the chemical defendants Dr. Sheldon H. Rabinovitz, an industrial hygienist and toxicologist, stated that there were no toxicology studies showing that ketone exposure results in the type of kidney failure experienced by the plaintiff or any animal, or that such kidney damage was characterized by shrunken kidneys. He also stated that the only effects seen in the kidneys of animals exposed to ketones were associated with a globulin (protein) not present in humans. He opined that the plaintiff could not prove that he was exposed to any amount of ketones for a sufficient period of time which, according to scientific studies, result in adverse effects such as liver changes or nervous system damage. Therefore, according to Rabinovitz, the plaintiff could not meet his burden of demonstrating causation of his injury from his exposure to ketones in the chemical defendants' products. Rabinovitz also asserted, in relation to the other defendants, that the plaintiff could not show that ESRD was caused by exposure to any off-gassing chemical from PVC extrusion.

The chemical defendants also submitted the affidavit of another expert Dr. David S. Goldfarb, a nephrologist, who reviewed the plaintiff's medical records from the time when his renal failure was first diagnosed. Dr. Goldfarb found no documentation of any significant chemical exposure, and stated that *no levels of any toxins in the plaintiff's blood, urine, tissue, or other bodily secretions were measured or reported* (emphasis added). According to this expert, the plaintiff presented a complete absence of

symptoms attributable to toxicologic exposures. Based upon his physical examination of the plaintiff, Dr. Goldfarb stated that the plaintiff had no skin changes, deterioration of teeth, pulmonary findings, heart disease, or neurologic disorders, or any other findings consistent with occupational exposure to harmful chemicals. Moreover, this expert asserted there was no recognizable medical authority which would sustain the theory that ESRD could be caused by exposure to chemicals. A probable alternative was presented, to wit, that the plaintiff suffered from a chronic condition that evolved over a substantial period of time.

In opposition, the plaintiff's experts indicated that during the plaintiff's employment, the plaintiff was exposed to unsafe levels of cyclohexanone, isophorone, methyl isobutyl ketone, and other toxins manufactured by the chemical defendants. In his affidavit and report, Dr. Jack Caravanos, an Industrial Hygienist, opined that given the frequency of such excessive, elevated, and lengthy exposure, it was "more likely than not that these workplace conditions produced elevated airborne levels and subsequently created elevated blood levels of chemicals" to which the plaintiff was exposed. No references to actual chemicals in the plaintiff's body were made, and no indication of medical literature concluding that such exposure, while otherwise potentially hazardous, would cause ESRD failure was set forth.

The plaintiff also submitted the affidavit and report of Dr. Jacqueline Moline, who practices Environmental and Occupational Medicine. Dr. Moline stated that the medical literature established that kidney injuries occur as a result of exposure to the toxins to which the plaintiff was exposed. She also stated that she considered other causes of the plaintiff's kidney failure and found that he did not have any of the recognized risk factors such as Hepatitis C or B, abnormal thyroid or collagen-vascular functioning, had no family history of kidney disease, and no history of hypertension, diabetes, or drug use.

In reply, the chemical defendants submitted an Occupational Safety and Health Administration (hereinafter OSHA) air sampling report of the Superflex factory from March 14, 2001, which indicated that butanone, hexone, antimony, beryllium, chromium, cobalt, copper, iron oxide, lead, manganese, molybdenum, nickel, vanadium, cadmium, cyclohexanone, isophorone, and vinyl chloride were all below the detection/reporting limits, and inferentially could not be causative of the plaintiff's alleged injuries. Moreover, the chemical defendants asserted without

contradiction that Dr. Caravanos assumed facts that were conjectural since they bore no relationship to the facts of this case. In particular, Dr. Caravanos' calculations contradicted the OSHA findings as to what the levels of safe exposure were, and he ignored the actual exposure data presented from the plaintiff's workplace. In contrast, the opinion of their expert Dr. Rabinovitz was based on information derived from actual data gathered at the site.

The chemical defendants asserted that Dr. Moline was not a qualified expert, as she is not a nephrologist and her opinions generally would not be accepted within the medical community of nephrology. Additionally, they contended that Dr. Moline's opinion was scientifically unreliable since she failed to identify a single study finding that occupational exposure to ketones over the course of 21 months can result in renal failure. She failed to account for the small size of the plaintiff's kidneys, the fact that 21 months was too short a time of exposure to cause ESRD, the absence in any cited literature conclusively linking ESRD with occupational exposure to chemicals, the lack of diagnostic data such as a kidney biopsy suggesting that the plaintiff's ESRD resulted from occupational exposure, and the fact that the higher rate of kidney failure among Hispanics was attributable to other causes. The chemical defendants' expert, Dr. Goldfarb, stated that chemical exposure that would have an adverse effect on the kidneys would also affect other organs, causing symptoms such as liver disease, skin changes, teeth deterioration, pulmonary findings, heart disease, or neurologic disorders. The plaintiff did not have any of these other marker symptoms.

Moreover, the chemical defendants argued that Dr. Moline's causation theory was speculative and unsupported by the references she cited. The chemical defendants' expert Dr. Rabinovitz stated that the animal studies cited by Dr. Moline showed that ketones did not cause kidney damage when the animals were not exposed to a second chemical. The patient reports cited by Dr. Moline involved kidney damage and not ESRD; one only mentioned ketones in passing, while the other made no mention of ketones. The epidemiological studies also did not support Dr. Moline's conclusion since one did not identify the chemicals studied and the other did not involve kidney disease or ESRD. The other reports referred to by Dr. Moline did not identify the ketones involved, or mention that the exposure caused kidney damage. Lastly, the chemical defendants allege that Dr. Moline also failed to quantify the plaintiff's alleged exposure to ketones.

Based on that record, the Supreme Court determined, and the majority herein concludes, that issues of fact are present.

For the reasons set forth below, I believe the order of the Supreme Court should be reversed insofar as appealed from, and the order dated June 30, 2006, granting that branch of the chemical defendants' motion which was for summary judgment dismissing the complaint insofar as asserted against them should be reinstated. In order to prevail in a toxic tort case, the burden is on the plaintiff to establish causation through an expert's testimony that exposure to the toxic material is generally recognized in the scientific community as capable of causing the particular illness, and that the plaintiff was exposed to sufficient levels of the toxic material to cause the illness (*see Parker v Mobil Oil Corp.*, 7 NY3d 434, 448 [2006]). Therefore, in the context of the inevitable motion for summary judgment to dismiss the complaint, the burdens of proof are virtually reversed. The defendant is required to prove the negative, to wit, that the plaintiff's injuries, whatever they may be, could not have been caused by the toxic material in question (*see Cinquemani v Old Slip Assoc., LP*, 43 AD3d 1096, 1097-1098 [2007]). To defeat such a motion, the plaintiff's burden is very slight. The plaintiff need only show that an issue of fact exists as to whether the toxic material in question might be a cause of the plaintiff's injuries (*see Miceli v Purex Corp.*, 84 AD2d 562 [1981]). However, as on any motion for summary judgment, unsubstantiated speculation will not suffice (*see Romano v Stanley*, 90 NY2d 444, 451-452 [1997]; *Edelson v Placeway Constr. Corp.*, 33 AD3d 844, 845 [2006]; *Kracker v Spartan Chem. Co.*, 183 AD2d 810, 811-812 [1992]). Therefore, the plaintiff must establish through an expert that the injuries in question could be attributable to the exposure to the toxic material, leaving to the trier of fact the ultimate determination whether there was exposure which did, in fact, cause the plaintiff's injuries (*see Clarke v Helene Curtis, Inc.*, 293 AD2d 701, 701-702 [2002]).

If a defendant is able to establish that the expert upon whom the plaintiff intends to rely is not properly credentialed or that the theories offered have not received general acceptance in the scientific community, the plaintiff's expert's testimony is rendered a nullity and the claim may be deemed incapable of proof (*see Heckstall v Pincus*, 19 AD3d 203, 204-205 [2005]).

In the present case, the chemical defendants established, prima facie, their entitlement to judgment as a matter of law by demonstrating that the plaintiff's injuries could not have been caused by the toxic materials in question, and further established that the theory of causation asserted by the plaintiff's experts is legally unacceptable. Specifically, the defendants

satisfactorily established, through their experts, that the plaintiff's injuries are attributable to circumstances other than his exposure to the toxic material in question. The defendants' experts identified the following irrefutable facts: (1) that one suffering from toxic exposure would be expected to have chemical tracers of some of the toxic material in his or her bodily fluids, and there was no indication of such findings in this plaintiff's medical records, (2) to the extent that the plaintiff may assert that undetected or undetectable toxic elements might have caused his injuries, there is no general acceptance in the scientific community of the theory propounded by the plaintiff's expert that any of the chemicals in question, but especially the ketones, cause ESRD in humans, (3) the plaintiff's experts are unable to cite any credible studies that demonstrate the causal relationship between the toxic materials and ESRD in humans, (4) the plaintiff is also unable to identify any credible animal studies that would lead one to conclude that the plaintiff's exposure could result in the injuries in question since the effect on the kidneys found in animals was limited to a protein which is not known in humans, (5) the plaintiff's expert Dr. Moline was not credentialed to offer opinions on nephrology, and (6) ESRD evolves over a period of time far greater than that in which plaintiff was alleged to have worked with the alleged toxic materials.

The plaintiff's response to this proof was simply insufficient to raise an issue of fact. The plaintiff's proof did not refute the necessity of the presence of chemical markers in toxic tort injuries or adequately address such markers herein. Similarly, the plaintiff offered no clinical evidence demonstrating that renal failure in humans was caused by exposure to ketones or any other of the alleged toxic materials (components in the ink or cleaning solvents) in question—a standard far below what the plaintiff must establish, to wit, that the exposure to the inks or cleaning solvents manufactured by the chemical defendants was generally accepted in the scientific and medical communities as a potential cause of the plaintiff's injury (*see Parker v Mobil Oil Corp.,* 7 NY3d 434 [2006]). Moreover, the plaintiff's expert Dr. Moline was not sufficiently credentialed in the field of nephrology, and consequently she was not able to address, much less contradict, the opinion of the chemical defendants' expert concerning factors leading to ESRD, its inability to spontaneously develop over a 21-month period, or its prevalence within the plaintiff's demographic profile. Moreover, Dr. Moline's opinions are rife with conjecture and surmise and were based on Dr. Caravanos's calculations as to the level of exposure, which themselves were made without the benefit of a

personal inspection of the chemical work site, and which created assumptions that were proved to be not remotely accurate by the chemical defendants' expert, who based his calculations on his personal inspection of the work site. Even if Dr. Moline's opinion were given some credence—to the extent that there might be some authority to support her opinion—in view of the chemical defendants' experts' reply affidavits, which clearly demonstrated that such theories are not generally accepted in the scientific and medical communities, such theories should, in this instance, be rejected.

For all of the foregoing reasons, I conclude that the order of the Supreme Court, upon renewal, denying that branch of the chemical defendants' motion which was for summary judgment dismissing the complaint insofar as asserted against them, should be reversed insofar as appealed from, and the order dated June 30, 2006 should be reinstated.